IN GROUND THREE OF MY HABEAS PETITION I ALLEGED

The voluntary **appearance** of the **Prosecutor** and his Chief **Witness** in a **fictitious reenactment** on National T.V. **prior to trial** was a Denial of Due Process, The Right to a Fair Trial as is guaranteed to me by the Fifth, Fourteenth Amendments as well as provisions of the Sixth Amendment and also the Maryland Constitution.

On pages 24-25 of Judge Cadigan's memorandum/opinion he incorrectly stated that I had waived this issue by saying:

"Again the petitioner **could have raised** this issue on Appeal **but neglected to do do** asserting ineffective assistance of counsel."

Judge Cadigan also **incorrectly agreed** with Judge Howe's finding at the Motion to Dismiss Hearing by saying that I could have **"corrected"** any **prejudice** by voir dire. Judge Cadigan said:

"As stated above, a proper **voir dire examination** would have alleviated any possibility that a juror would have been exposed to any **prejudicial information** regarding petitioner's case. There is no evidence presented at the postconviction hearing that supports the claim that the petitioner was denied due process or a right to a fair trial by the State's Attorneys's **participation** in the **Unsolved mysteries video**. A bald allegation **unsupported** by the record is not an appropriate basis for postconviction relief. For these reasons the petitioner's request for postconvictioon relief to **GROUND THREE** is denied."

In my **ORIGINAL PETITION** I had asserted that The Constitution of these United States as well as the Maryland Constitution **prohibits pretrial reenactments** of factual issues that should only be developed within the **sanctity** of the courtroom. The purpose of determining the truth is to **inside the courtroom**. It is a "**sine qua non**" of a fair trial, and a **basic requirement** of Due Process. In the instant case, a television producer was able to **disturb the facts** of the case by having a **hired actor** fictitiously portray a "gun" pointed at the State's witness.

GROUND 3-1

**SCANNED**

I am sure that <u>No Federal Prosecutor</u> would ever be allowed to take part in any <u>pretrial reenactment</u> on National Television. I am also avering that the State prosecutor should be held to the <u>same standard</u>. Any participation of a State or Federal government official could only result in <u>prejudice</u> to any defendant's case. I also believe that the U.S. Supreme Court cases that I cited in my <u>ORIGINAL</u> petition <u>take precedent</u> over Judge Cadigan's opinion. Those cases were <u>Sheppard v. Maxwell</u> 86 S.Ct. 1507, (1966), and <u>Estes v. Texas</u> 85 S.Ct. 1507, (1966). <u>BOTH CASES</u> have been <u>clearly established federal law</u> which Judge Cadigan and the Attorney General have failed to recognize and have been in effect for many years.

The procedure employed by the Prosecutor in this case was a <u>fraudulent portrayal</u> that the whole nation was subjected to. I do not believe that the State can be allowed to use the <u>power</u> of their office, their <u>influence</u>, and their <u>resources</u> to take an active part in and portray a <u>fictitious version</u> of factual events as the State claimed them to be, and would like the television audience to believe. This would also <u>contaminate</u> a prospective jury pool who may have seen the program.

It would and in this case <u>it did set the stage</u> in the advantage of the prosecution by allowing one of the <u>hired actors</u> to vividly portray a "gun" being held to the head of the State's witness when there was <u>never any gun</u>.

This "gun" would have led any television audience or potential jury member to believe the charge of <u>"kidnapping"</u>. The television audience was subjected to a <u>Famous Actor</u> introduce the program as a <u>"reenactment"</u>, in which the state took an active role by participating. Judge Cadigan as well as the Attorney general fail to recognize that the <u>prosecutor</u> speaks for the state, and his actions could have <u>influenced</u> prospective jurors who may have seen it when it was televised and believe what they saw was factual.

GROUND 3-2

On **November 24, 1997** Judge Howe presided over a **Motion To Dismiss** Hearing based on **Prosecutorial Misconduct**, and violations of **Maryland Rules (3.6), (3.8).** This was **LONG BEFORE** my trial attorney had any knowledge of the allegations made to him by Officer Rubie on **April 02, 1999** which are contained in the five page affidavit by my trial attorney regarding **new allegations** of prosecutorial misconduct.


On pages 55-56 Anello said: "Sinclair goes on to say the defendant need not prove actual prejudice because on the basis of public policy it will be **presumed to exist** as a matter of law... We're showing you that the prosecution here has actively, almost joyously **participated** in the **manufacture** of pretrial adverse publicity, and that's what the rule was meant to prevent... And when you become involved in a case to the point where you're **manufacturing pretrial publicity**, without concern appearing in broadcasts... then you become more than an advocate..."

On page 57 Anello said: "Here we can see actual malice and prejudice in the public statements of the State's Attorney Office. Both in the Unsolved mysteries and the statements to the Sunpapers it is a **false portrayal of events** that occurred, or a portrayal that **the State participated in**... You have the other problem that, in effect, by **creating the pretrial publicity** my defendant is being denied his Sixth Amendment right to to a fair trial... the state engaging in violating this rule...

At page 58 he continued by saying: "You're denying the defendant his right to a fair trial in the Sixth Amendment, the United States Constitution and the Maryland Declaration of rights... I believe the court has to move under the Lykins case and the Young and Sinclair cases to **remove Mr. Norman** from the case and every member of the State's Attorney Office of Baltimore County and appoint a Special Prosecutor... The fact that those cases deal with conflict of interest is nothing where it's written that the Code of Professional Responsibility rule is any more important to the administration of justice than the **fabrication of false pretrial publicity**."

GROUND 3 PAGE 3

Since I do not have any legal training I think it important to once again **STRESS** that this passionate summary by my trial attorney was presented in court **long before** we had any knowledge of Officer Rubie's allegations of **prosecutorial misconduct** at the ballgame on **April 02, 1999**. In addition I would also like to also **STRESS** that the transcript of this Motion Hearing **was never transcribed until January 2004**. This was more than **two years** after my direct appeal. Therefore my Appellate Counsel **could not and did not** raise a single issue on direct appeal that was argued by my trial attorney regarding Prosecutorial Misconduct, and violations of the Md. Rules of Professional Conduct. I mention this because it is a part of my argument of **Ineffective assistance of Appellate Counsel**.

Since this Motions hearing there have been numerous cases in the District Court of Maryland, as well as Fourth Circuit Court of Appeals cases which deal with **pretrial publicity**. One such case would be U.S. Court of Appeals in re Joseph D. Morrissey, **No. 98-4168** decided on Feb. 11, 1999, and **No. 02-1105** decided on Sept. 11, 2002. Both cases decided against the offending attorney for violations of pretrial publicity, and one led to his **sanction**.

Another case was <u>U.S. v. Josephine Gray</u>, decided on Feb. 06, 2002. This case was decided by Judge Chasanow of the U.S. District Court in Greenbelt Md. and involved **violations of Md. Rule 3.6** which is equivalent to a Local Federal Rule. Judge Chasanow made the following comments:

"Extrajudicial statements to **media** by parties, **attorneys**, law enforcement personnel, and **witnesses** threatened defendant's fair trial rights and the **ability to empanel** an impartial jury. Both the Md. Rules of Professional Conduct **AND** the local rules **of this court** prohibit a lawyer from making an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication...

GROUND 3 PAGE 4

I would like to also **STRESS** that Judge Chasanow had used the terms that it was the **Extrajudicial statements to the media** which in her opinion had "**threatened** defendants's fair trial rights and the ability to **empanel an impartial jury**". The same would also apply in the instant case but **even more so** since my prosecutor took an active part in the production of the program, and **allowed** his **witness** to participate in it as well.

Judge Chasanow also stated in her written opinion what effects **comments by the prosecutor** could have on a potential jury by stating:

"Comment by persons with access to **information not yet disclosed** in judicial proceedings about those matters set forth in the **applicable rules is improper** and may well **influence** prospective jurors. Certainly voir dire will be prolonged and the **seating** of an **impartial jury** may be **imperiled**."

I am sure that the U.S. Constitution **does not provide** for any prosecutor (State of Federal) to be able to **participate in false pretrial publicity** which allows only for the State's version to be shown prior to trial which would undoubtedly **taint a prospective jury pool**.

I believe it also necessary to once again visit Judge Cadigan's statement on **page 25** of his memorandum/opinion where he stated:

"There was no evidence presented at the postconviction hearing that supports the claim that the petitioner was denied due process or a right to a fair trial by the State's Attorney's **participation** in the Unsolved Mysteries video. **A bald allegation** unsupported by the record is not an appropriate basis for postconviction relief. Tucker v. Warden, 243 Md. 331, 333 (1966). For these reasons, the petitioner's request for post conviction relief as to **GROUND THREE** is Denied."

I believe this ruling by Judge Cadigan is contrary to established Federal Law that the rulings which I have cited by the Fourth Circuit Court of Appeals demonstrates that Judge Cadigan was in error.

**GROUND 3 PAGE 5**

I am attaching additional **EXHIBITS** that are taken directly from the **TRANSCRIPT** of the MOTION TO DISMISS HEARING which my appellate lawyer **failed to have transcribed** during my direct appeal. I am bringing this to the court's attention because I feel that this is **just one** example of his ineffectiveness. This would mean that he **failed** to provide the appellate court with a **complete record**. In addition he also **failed to raise** a single issue regarding Mr. Norman's violations of the Md. Rules of Professional Conduct 3.6 regarding Pretrial Publicity, and Rule 3.8 regarding the Special responsibility of a Prosecutor.

In addition, I am also submitting these EXHIBITS in order to show this Court that Judge Howe heard the testimony of Mr. Norman when he was called to the stand by Mr. Anello. She was shown the **videotape** of the Unsolved Mysteries video that both Mr. Norman and his witness had appeared, and yet she **RULED** that there were **NO VIOLATIONS** of the Maryland Rules of Professional Conduct by Mr. Norman. I also think it **IMPORTANT** to state that approximately five days after this hearing, Judge Howe was **specially assigned** to become the **trier of fact**. This is when we filed the MOTION TO RECUSE JUDGE HOWE. We had done so for several reasons which were, (1) She ruled there were **NO VIOLATIONS** of Maryland Rules 3.6 and 3.8 by Mr. Norman. (2) Also because she saw a videotape which **disturbed the facts** of the case. (3) Judge Howe was exposed to **extrajudicial comments** by **BOTH** Mr. Rodricks of the Baltimore Sunpapers, and my ex wife MS. Smith, who gave **on camera interviews** which were false, and could not be challenged at trial since they had **NOTHING** to do with the case. (4) Judge Howe was also exposed to a **fictitious version** of factual events which **were in dispute** such as the fictitious "gun" being introduced by the **Hired Actor**, the fictitious "threats", the fictitious "beating", and fictitious "kidnapping" that was presented by **the hired actors** who were all hired by the **producer** of the program that **interviewed Mr. Norman** at the rented house.

My reasons for taking so much time in trying to explain this to the Court is to try and demonstrate **in laymen's terms** how appellate counsel **failed** to give me effective assistance of counsel during my **direct appeal**, and what our reasoning was for filing the MOTION TO RECUSE JUDGE HOWE.

I am attaching EXHIBITS that are copies of the transcript which my appellate attorney failed to have transcribed for my direct appeal. I am doing so because they contain the **testimony** of the prosecutor Mr. Norman, and the court will be able to see by that testimony that he had no doubt that this program was going to be aired on National Television. I also ask the court to notice that in the next few pages of transcript you will be able to see Mr. Norman acknowledging the following:

a.) He admitted he was **not present** when his witness was being interviewed by the Director of the program.

b.) He admitted that he had **no knowledge** what his witness was going to say on **National television prior to trial**.

c.) He admitted **on the record** that he was never asked to render an opinion **about the facts** of the case.

d.) He admitted that **HE WAS THE ONE** who told the director of the program that **there was a "gun"** pointed at Mr. Hogg's head when in fact this was **never alleged** prior to this time.


I begin with **EXHIBIT-6** beginnin at line 9 of PAGE 36 of the transcript:

"He actually flew in from California. He was touted as a director. He sat down with me. He kind of explained how they go about things and **specifically** to me **they don't do script stuff**. I asked him that question cause I thought if I was ultimately going to be on television I didn't want to look really really stupid. Just moderately stupid was okay. Said **they don't do scripts**; they would just interview me, and then at some point in time if they were going to use you know, **whatever I had to say**, they would **put it on televsion**. Sometime thereafter your Honor--again I don't remember the days, **I was told to appear** at a house they actually rented in Timonium--I went up there, sat down. He asked me a bunch of questions. **They videotaped it**. The next thing I knew it was on the air. But I never contacted them."


GROUND 3 PAGE 7

**EXHIBIT-7** is a copy of PAGE 37 of the transcript. The court can see that my trial attorney had asked if the director of the program had misrepresented anything that Norman told him, and Norman's attorney objected which was sustained by Judge Howe.

Mr. Norman then admits that he had obtained the permission of The State's Attorney for Baltimore County before going on the program, and he also admitted that he had **no knowledge** how the program was going to be depicted to the television audience.

**EXHIBIT-8** is PAGE 38. Mr. Norman was asked if he was involved in the screening of the reenactment. His answer was:
None, whatsoever. There was **no rehearsal**. I mean show up, answer questions."

"I wasn't even there when **Mr. Hogg was being interviewed**. And I remember **seeing Rodricks** at this house they rented, but I wasn't present while anybody was being interviewed."

**PLEASE NOTE** That Rodricks was the reporter from the Baltimore Sunpapers who had **nothing** at all to do with the case, and was allowed to give his own **"on camera interview"**. We were never allowed to challenge Mr. Rodricks **false and exaggerated** statements while on camera. His "testimony" on camera was played to millions of members of the television audience along with the testimony of my ex wife who also had **nothing** to do with the case. Judge Howe heard each of their statements, and we were never allowed to challenge them in court since they were not a part of the case. Judge Howe heard the entirety of their interviews during the Motions Hearing and became a part of the reasoning for asking for her recusal since we believed these to be **extrajudicial statements**.

At the bottom of page 38 Mr. Anello then says to Norman:
     "So you went on the show stated your piece, which is fairly and accurately represented, what we just saw, **not knowing** what other people were telling Unsolved Mysteries."

EXHIBIT-9 is a copy of PAGE 39 of the transcript. Mr. Norman admits to Mr. Anello that the director of the program never bothered to ask Norman to render an opinion about the facts of the case.

He also admits that he received a call from Mr. Hogg and Ms. Smith and they discussed going on the program. He goes on to say that he had **no problem** with them going on the program. And then when he was asked if either of them asked for his permission and he stated:

    "No they did not. I couldn't give it one way or the other."

Mr. Norman fails to see that **he is responsible** for the actions of his witness giving **extrajudicial statements**. The 4th. Circuit Court of Appeals has had occasions to rule on this in the past, and I cited several of them in my Original habeas petition to this Court. Those cases were U.S. Ct. of Appeals for the 4th. Cir. at 726 F.2d 1007. This was a case involving a suit between the Nazi party and the Ku Klux Klan. Judge Flannery had ruled in part:

    "potential witnessed **SHALL NOT** make extrajudicial statements that relates or concerns or discusses the testimony of potential witnesses...by means of public communication..."

Another case was Prof. Journalists et al v. The Honorable Robert Martin Jr. 556 F.2d 706, 1977. Judge Martin had **ORDERED AND PROHIBITED**:

(1) **Lawyers and witnesses** from making extrajudicial statements.

(2) **Lawyers and witnesses** from mingling with the press.

(3) **Witnesses** were prohibited from **news interviews** during the trial period.

The main cases I cited in my **ORIGINAL** habeas petition were Sheppard v. Maxwell 86 S.Ct. 1507, 1966 and Estes v. Texas, 85 S.Ct. 1628, 1966. Both cases are U.S. S.Ct. cases that have been recognized for more that 40 years as Clearly established Federal law and applies to the Issues raised in Ground Three of my Habeas.

**EXHIBIT-10** is a copy of **page 40** of the transcript. Mr. Norman denied that he received any payment but thought he would lend a bit of "humor" to the situation by stating at line 3 that he **"Had to fight"** for a Hat which said Unsolved Mysteries.

At line 7 Norman was asked by my trial attorney if he saw a depiction of the show, where it was shown that a "gun" was being held to the back of the head of Mr. Hogg, and Mr. Norman states at line 11:

> **"Yes I did say that"**.

Then when Mr. Anello tried to point out that this was **never alleged** in the police reports, and throughout Mr. Norman's own allegations or **in the indictment**. Mr. Norman's attorney (Mr. Pate) objected, and Judge Howe sustained the objection, and we were prevented from going any further with this questioning. But Mr. Anello did get Mr. Norman **to state on the record** that it was **Mr. Norman** who said that there was a "handgun" pointed at Mr. Hogg. I would like to **REPEAT** that prior to this admission by Mr. Norman this was **never alleged** until the filming of the **Unsolved Mysteries Video** that was shown to on national television on two occasions **prior to trial**.

I now ask the Court to look at my **ORIGINAL** habeas petition and go to page (8) of GROUND 3. I had quoted the following which I repeat again comes from the Shepard Court and said:

> "If **publicity** during the proceedings threatens the fairness of the trial, a new trial should be ordered. But we must remember that reversals are but pallatives; the cure lies in those remedial measures that will **prevent the prejudice** at it's inception. The Courts must take steps **by rule and regulation** that will protect their processes from **prejudicial outside interferences**. Neither **PROSECUTORS** of defense, the accused, **WITNESSES**, court staff nor **ENFORCEMENT OFFICERS** should be permitted to frustrate it's function. Collaboration between counsel and the press as to information **affecting the fairness** of a criminal trial is not only subject to regulation but is **highly censurable and worth of disciplinary measures**".

GROUND 3 PAGE 10

Therefore in conclusion of my arguments for **GROUND THREE**, I believe that I am entitled to relief under the Supreme Court cases of **Sheppard, and Estes**. Both of these cases dealt with **Pretrial publicity** which Judge Howe who was the trier of fact, and Judge Cadigan who was the postconviction court, as well as the Attorney General all **failed to recognize**, and have been clearly established Federal law for more than 40 years. Both of these cases **would prohibit** a Federal Prosecutor from taking part in any **pretrial "reenactment"**. Mr. Norman should be held to the **same standard**.

In addition, I also believe that I have met the two prong burden for Ineffective Assistance of Counsel as discussed in <u>Strickland v. U.S.</u>, 104 S.Ct. 2052, (1984). I also believe that I have shown how Appellate Counsel (Mr. Greer) had failed to meet the criteria set out in <u>Evitts v. Lucey</u>, by the U.S. S.Ct. when they said:

"The Fourteenth Amendment **guarantees** a criminal appellant pursing a **first appeal** as of right certain minimum safeguards necessary to make that appeal **adequate and effective**. See <u>Griffin v. Illinois</u>, 351 U.S. 12, 20, 76 S.Ct. 585, 591 (1956)... First Appeal as of right is not adjudicated in accord with due process of law if appellant does not have effective assistance of attorney. U.S.C.A. Const. Amends. 6 and 14."

I am avering that Mr. Norman's appearance in his **Official Capacity** supported what the **hired actors** portrayed to the television audience, and that these **actors** had performed to a **script** that they were given. This concludes my reasoning as to GROUND THREE.

Mr. Norman's voluntary **appearance** and his **Witness** in a **fictitious reenactment** on National T.V. **prior to trial** was a Denial of Due Process, and the right to a fair trial as is guaranteed to me by the Fifth, Fourteenth Amendments as well as provisions of the Sixth Amendment and the Maryland Constitution as well.

GROUND 3 PAGE 11

1    want to, fine.  My biggest concern is getting this

2    Defendant back to stand trial.

3         I quizzed him about the, the percentage of

4    success they had in such cases and I believe he told me

5    somewhere in the neighborhood of 60 percent.  He asked me

6    if I'd be available to discuss this matter with, you know,

7    the, the actual production people.  Said sure.  At some

8    time thereafter I met an individual whose name is escaping

9    me.  He actually flew in from California.  He was touted

10   as a director.  He sat down with me.  He kind of explained

11   how they go about things and specifically told me they

12   don't script stuff.  I asked him that question, 'cause I,

13   I thought if he was ultimately going to be on television,

14   I didn't want to look really, really stupid.  Just

15   moderately stupid was okay.  Said they don't do scripts;

16   they would just interview me, and then at some point in

17   time if they were going to use, you know, whatever I had

18   to say, they would tout put it on, you know, put it on

19   television.

20        Sometime thereafter, your Honor -- again, I

21   don't remember the days I was told to appear to a house

22   they actually rented in Timonium -- I went up there, sat

23   down.  He asked me a bunch of questions.  They videotaped

24   it.  The next thing I knew it was on the air.  But I never

25   contacted them.

EXHIBIT - 9

1    Q.    Now, did, did the producers or the director

2    of, of the show misrepresent anything that you told them?

3    A.    Anything I told them?

4    MR. PATE:  Objection.

5    Q.    (MR. ANELLO)  Yes.

6    MR. PATE:  Objection.

7    THE COURT:  Sustain.

8    Q.    (MR. ANELLO)  Did the picture on the show

9    fairly and accurately portray what you told them?

10   A.    You mean what I said?

11   Q.    Yes.

12   A.    What you saw on the television with me

13   speaking?  What I said on television with me speaking?

14   Q.    That's all I'm asking.

15   A.    No.

16   Q.    And you consented to be there?

17   A.    Yes.

18   Q.    Okay.  Did you obtain the approval and

19   consent of Sandra O'Connor before you went on the show?

20   A.    Absolutely.

21   Q.    And she gave her permission for you to be on

22   the show?

23   A.    That's correct.

24   Q.    You do admit that you had no knowledge of how

25   the show was going to be depicted, other than what you

1    said?

2         A.    I don't know what you mean by that.   You

3    ask --

4         Q.    Did you have any knowledge -- we just saw a

5    depiction of the show, of, of, on, of this, this scene of

6    events, the re-creation of the assault on Mr. Hogg.   You

7    just saw that in court?

8         A.    Yes.

9         Q.    Okay.   Did you have any role in the depiction

10   of those events?

11        A.    None, whatsoever.

12        Q.    Okay.   Prior to appearing on the show did you

13   have involve, were you involved in any screening of the

14   reenactment of these events?

15        A.    None, whatsoever.   There was no, there was no

16   rehearsal.   I mean, it was show up, answer questions.

17        Q.    Okay.

18        A.    I wasn't even there when Mr. Hogg was being

19   interviewed.   And I remember seeing Rodericks at this

20   house they rented, but I wasn't present while anybody was

21   being interviewed.

22        Q.    So you went on the show and stated your

23   piece, which is fairly and accurately represented, what,

24   what we just saw, not knowing what other people were

25   telling Unsolved Mysteries?

EXHIBIT 8

1      A.    That's correct.  Never asked me to render --

2      Q.    Okay.

3      A.    -- opinion about the facts of the case.

4      Q.    Okay.  Did you have any, did, did the, either

5 Mr. Hogg or Miss Smith contact you to seek your advice as

6 to whether they should appear on the show or not?

7      A.    They didn't contact me asking me that

8 question, specifically.  They did at some point in

9 preparation for whatever was going to happen with the

10 show.  They actually called me and said they, they were

11 contacted by this gentleman named Selby, and then the

12 other guy who's, who was the director -- I don't remember

13 his name -- and did I see any problem with it.  And I told

14 him, and if you're asking me in terms of prosecution, no.

15 I mean, as long as you tell the truth, I've got no problem

16 with it in terms of prosecution.  And then I went on to

17 explain to them I've got no control over what you folks

18 do, anyway.

19      Q.    Did they ask for your permission to be on the

20 show?

21      A.    No, they did not.  I couldn't give it one way

22 or the other.

23      Q.    Did you receive any, did you receive any

24 economic reward for going on the show?

25      A.    I got a baseball hat says Unsolved Mysteries

1    on that.

2            Q.    All right.

3            A.    Had to fight for that.

4            Q.    Okay.  You never got any, any expense money

5    or any- -

6            A.    Nothing, whatsoever.

7            Q.    Okay.  And so you, you saw on the depiction

8    of the show a recreation where I believe it was Mr.

9    Shaffer is holding a handgun to the back of the head of,

10    of the victim, Mr. Hogg?

11            A.    Yes, I did say that.  (SEE The Information)

12            Q.    Okay.  Throughout the police reports and in

13    your own allegations in terms of the, the indictment,

14    isn't it true that that's never been alleged?

15                    MR. PATE:    Objection.

16                    THE COURT:    Sustain.  ( of Counsel )

17            Q.    (MR. ANELLO)  In regard to the Sunpapers

18    article that was quoted around the time of the arrest,

19    August 29, '97, done by Miss Melodie Simmons, did those

20    statements there made by you, that force and effect kind

21    of made my day and that guy needs to go to jail, is that

22    accurately and fairly represent what you told Miss Simmons

23    in the article appearing in the Baltimore Sun on August

24    29th, 1997?

25            A.    Somewhat.  They're out of context.  The

EXHIBIT-10